IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JACKIE R. WILKINS

               Plaintiff,

    Vs.                                No. 05-4074-SAC

KMART CORPORATION,

               Defendant.

MEMORANDUM AND ORDER

        The case comes before the court on the defendant's motion for summary judgment (Dk. 50) and on the plaintiff's motion for summary judgment (Dk. 53) in this workers compensation retaliatory discharge case. The plaintiff started working on March 11, 2003, at the defendant's Lawrence Distribution Center.  During his probationary period he was injured when a box dropped on him while he was unloading a trailer.  After reporting his injury, the plaintiff received medical treatment as arranged by the defendant.  The plaintiff continued working with restrictions until he was released without restrictions on May 31, 2003.  Following the defendant's approval of the plaintiff's probationary period on June 16, 2003, the defendant was given a bank of hours to be used for chargeable absences during the next three-month period.  The defendant's policy called for

termination if an employee exceeded his bank of hours.  Between June 17 and June 25, 2003, the plaintiff was absent from work or left early and exceeded his allotted bank of hours.  Upon being notified on June 25, 2003, that he was being terminated for exceeding his bank of hours, the plaintiff advised that his absences were due to the medication he was taking for his work-related injury.  The defendant investigated the plaintiff's representation and terminated the defendant on June 26, 2003.

The plaintiff claims that the defendant retaliatorily discharged him for absences caused by the medication taken for his work-related injury and that the defendant knew the cause of his absences based on his reports at the time of the absences and his statement on June 25th.  The defendant denies that the plaintiff's chargeable causes were due to medication for his work-related injury, denies that it knew or should have known of this claimed cause prior to June 25th, and denies that it acted on a retaliatory intent in discharging the plaintiff.

**SUMMARY JUDGMENT STANDARDS**

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law.

2

The court is to determine "whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will . . . preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In applying this standard, "[a]ll inferences arising from the record before us must be drawn and indulged in favor of the [nonmovant]." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003) (internal quotation marks omitted). "Credibility determinations [and] the weighing of the evidence . . . are jury functions, not those of a judge." *Id.* at 1216 (internal quotation marks omitted). Nevertheless, "the nonmovant must establish, at a minimum, 'an inference of the existence of each element essential to [her] case.'" *Croy v. COBE Laboratories, Inc.*, 345 F.3d 1199, 1201 (10th Cir. 2003) (quoting *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)).

3

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992). If this burden is met, the nonmovant must "set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). (citations omitted). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir. 1995). Only admissible evidence may be reviewed and considered in a summary judgment proceeding. *See Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Intern.,*

4

*Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The summary judgment inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.  More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed. R. Civ. P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

**RELEVANT SUBSTANTIVE LAW–RETALIATORY DISCHARGE**

Kansas courts have extended the tort of retaliatory discharge from an employer firing in retaliation an employee for having filed a workers compensation claim to encompass an employer firing in retaliation an injured employee "who would be likely to file statutory claims in the near future." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (citing *Ortega v. IBP, Inc.*, 255 Kan. 513, 516, 874 P.2d 1188 (1994)); *see Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, 1140 (10th Cir. 2003) (employee "sustained an injury for which she could or might assert a future claim for benefits."(citations omitted)).  "[E]ven where the employee had not yet filed a workers compensation claim, an employer

5

is prohibited from firing an employee who is absent from work due to a

work-related injury and who might file a workers compensation claim."

*Ortega v. IBP, Inc.*, 255 Kan. at 516; *See Coleman v. Safeway Stores, Inc.*,

242 Kan. 804, Syl. ¶ 3, 752 P.2d 645 (1988);[1] *Foster v. Alliedsignal, Inc.*,

293 F.3d 1187 (10th Cir. 2002).  Thus, an employee's absences caused by

the employee's work-related injury should not be counted against the

employee by his employer.  *Foster*, 293 F.3d at 1192.

      The plaintiff's burden is to prove he was fired "based on,

---

[1]In 2004, the Kansas Supreme Court in *Gonzalez-Centeno v. North Cent. Kansas Regional Juvenile Detention Facility*, 278 Kan. 427, 434, 101 P.3d 1170 (2004), noted that the "broad liability language from *Coleman*" no longer represented the current law of Kansas:

> "With a variety of facts presented and a burden-shifting analysis adopted in subsequent cases, the statement from *Coleman* has been treated not as a rule of law but rather as depending on the peculiar circumstances of each case.  Thus, we conclude that whether an employer's discharging an employee for failing to call in an anticipated absence that results from a work-related injury gives rise to liability is a question of fact.  Language to the contrary in *Coleman*, 242 Kan. 804, Syl. ¶ 3, 752 P.2d 645, is disapproved."

278 Kan. at 434.  The Kansas Supreme Court goes on to quote and endorse the burden-shifting analysis used by the Tenth Circuit in *Bausman* on the rule from *Coleman* and, in particular, to recognize that under some circumstances an injured employee's attendance record and compliance with the employer's attendance policy may be a legitimate, non-retaliatory reason for the employer's termination.  278 Kan. at 438-440.  Thus, an employer's liability for discharging an employee for absences resulting from a work-related injury is ultimately a question of fact, namely whether the employer acted with an unlawful retaliatory intent.  278 Kan. at 439-40.

because of, motivated by or due to" the defendant's intent to retaliate.

*Foster v. Alliedsignal*, *Inc.*, 293 F.3d at 1192 (internal quotations and

citations omitted).  The plaintiff need not prove this retaliatory intent with

direct evidence and need not establish that it was the only reason or motive

behind his discharge.  *Id.*  The plaintiff, however, has the burden of proving

his claim of retaliatory discharge by a preponderance of evidence that is

"clear and convincing in nature.'"  *Bausman*, 252 F.3d at 1115 (quoting

*Ortega v. IBP, Inc.*, 255 Kan. at 528).  Evidence is "clear" when "certain,

unambiguous, and plain to the understanding."  *Id.*  Evidence is

"convincing" when "reasonable and persuasive enough to cause the trier of

fact to believe it."  *Id.*  While this clear-and-convincing standard of proof

applies to summary judgment motions in federal court, this "is not a license

to engage in a mini-trial," does not elevate the motion proceedings into a

trial on affidavits and depositions, and does not authorize the court to

assume jury functions.   *Foster*, 293 F.3d at 1195

      Not unlike employment discrimination cases, retaliatory

discharge cases typically rely on circumstantial evidence, not direct

evidence, to prove the employer's unlawful intent for discharging an

employee.  *Foster*, 293 F.3d at 1192.  Consequently, "Kansas appellate

7

courts have adopted the burden-shifting analysis of discrimination and free

speech cases for use in workers compensation discharge cases."

*Gonzalez-Centeno v. North Cent. Kansas Regional Juvenile Detention*

*Facility*, 278 Kan. 427, 437, 101 P.3d 1170 (2004) (citing *Rebarchek v.*

*Farmers Co-op. Elevator & Mercantile Ass'n*, 272 Kan. 546, 553, 35 P.3d

892 (2001)).  The Kansas Supreme Court recently summarized this

applicable analysis:

> With the burden-shifting analysis the complainant initially must
> present a prima facie case of being fired for exercising his or her
> workers compensation rights.  The elements of a prima facie claim for
> retaliatory discharge for filing a workers compensation claim are: (1)
> The plaintiff filed a claim for workers compensation benefits or
> sustained an injury for which he or she might assert a future claim for
> such benefits; (2) the employer had knowledge of the plaintiff's
> workers compensation claim injury; (3) the employer terminated the
> plaintiff's employment; and (4) a causal connection existed between
> the protected activity or injury and the termination.  272 Kan. at 554,
> 35 P.3d 892.  Upon such a showing, the burden shifts to the
> employer to articulate a legitimate, nonretaliatory reason for
> terminating the employee.  Once the employer discharges this
> obligation, the complainant must continue with the burden of proving
> by a preponderance of the evidence that the reasons offered by the
> employer were merely a pretext for wrongful termination.  272 Kan.
> 546, Syl. ¶ 5, 35 P.3d 892.

*Gonzalez-Centeno,* 278 Kan. at 437.  "The requisite 'causal connection' is

the unlawful intent on the part of the employer to terminate the employee

because the employee has filed a statutory claim, or has been injured and

8

may file such a claim." *Bausman*, 252 F.3d at 1116.[2] "A causal connection may be demonstrated by evidence such as protected conduct closely followed by adverse action." *Hysten v. Burlington Northern Santa Fe Ry. Co.*, 372 F. Supp. 2d 1246, 1254 (D. Kan. 2005) (citing *Connor v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997)).

When the employee claims retaliatory discharge based on the employer's wrongful counting of absences resulting from the employee's work-related injury, the causal connection element requires additional proof for the prima facie case to sustain an inference of the employer's unlawful retaliatory intent.  The plaintiff must "show that, at the time of her discharge, the decision-makers who terminated her employment were aware or should have been aware that the absences for which she was discharged were the result of a work-related injury." *Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 876 (10th Cir. 2004).  This additional proof is consonant with the tort of retaliatory discharge being an intentional tort and not "a matter of strict liability." *Bausman*, 252 F.3d at 1115. "'Retaliatory discharge is an intentional tort: it is committed only when the employer

---

[2]This language may overstate the significance of this element, for it is proof of the entire prima facie case that "raises a rebuttable presumption of a retaliatory intent." *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1276, 38 P.3d 679 (Kan. 2002) (quotation marks and citations omitted).

discharges the employee for an improper reason.'"  *San Juan v. IBP, Inc.*,

90 F. Supp. 2d 1208, 1211 (D. Kan. 2000) (quoting *Bausman v. Interstate*

*Brands Corp.*, 50 F. Supp. 2d 1028, 1042 (D. Kan. 1999), *rev'd on other*

*grounds*, 252 F.3d 1111, 1115 (10th Cir. 2001)); *see also Bones*, 366 F.3d

at 876 ("a plaintiff must prove an unlawful intent on the part of the employer

to terminate her" (citation omitted)); *Ramirez v. IBP, Inc.*, 913 F. Supp.

1421, 1435 (D. Kan. 1995); *Rebarchek v. Farmers Co-op Elevator &*

*Mercantile Ass'n*, 272 Kan. 546, 559, 35 P.2d 892 (2001) ("the issue of

discriminatory intent").  It necessarily follows that "[t]he mere act of firing an

injured employee for excessive absences or for violation of an absenteeism

policy does not implicate an improper retaliatory motive, particularly when

the decision-makers were not aware that the absences were due to work-

related injuries."  *Bones*, 366 F.3d at 876 (citation omitted).  Thus, proof of

the employer's knowledge is critical for the prima facie case to serve its

purposes of ruling out the most common non-retaliatory reasons for the

employer's conduct and of sustaining a rebuttable presumption of a

retaliatory intent.

　　　　Once the defendant employer offers a legitimate, non-

retaliatory reason for termination, "the prima facie presumption of unlawful

10

intent 'drops out of the picture.'" *Gonzalez-Centeno*, 278 Kan. at 438.  The

plaintiff employee to avoid summary judgment must come forward with

"'specific facts establishing a triable issue as to whether the employer's

reason for discharge is a mere cover-up or pretext for retaliatory

discharge.'" *Foster*, 293 F.3d at 1194 (quoting *Bracken v. Dixon Indus.,*

*Inc.*, 272 Kan. 1272, 1276, 38 P.3d 679, 682 (2002)).  Put another way, the

plaintiff may not rely on mere conjecture but must "'demonstrate a genuine

dispute of material fact as to whether the proffered reasons were unworthy

of belief.'" *Bausman*, 252 F.3d at 1120 (quoting *Morgan v. Hilti, Inc.,* 108

F.3d 1319, 1321 (10th Cir. 1997)).   In *Bausman*, the Tenth Circuit

emphasized that a plaintiff to defeat summary judgment "need not

affirmatively demonstrate" a retaliatory motive and may rely on "'such

weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action

that a reasonable factfinder could rationally find them unworthy of credence

and hence infer that the employer did not act for the asserted non-

discriminatory reasons.'"  252 F.3d at 1120 (quoting *Morgan*, 108 F.3d at

1323).  "Temporal proximity is sufficient to establish the causal connection

element of a prima facie case, but is not sufficient–standing alone–to raise

a genuine issue of pretext." *Hysten*, 372 F. Supp. 2d at 1254-55 (citing in

part *Annett v. University of Kansas*, 371 F.3d 1233, 1241 (10th Cir. 2004)).

**STATEMENT OF UNCONTROVERTED FACTS**

Through factual stipulations appearing in the pretrial order, the

parties have agreed on much of the factual background.  What appears

here incorporates those stipulations as well as the facts found to be

uncontroverted from reviewing the briefs and attachments submitted in

support of both summary judgment motions.  Some of the contested factual

issues also will be described and discussed here.

The defendant Kmart Corporation ("Kmart") hired the plaintiff

Jackie Wilkins ("Wilkins") and assigned him to work third shift (11:15 p.m.

to 7:15 a.m.) in its receiving department at the Lawrence Distribution

Center.  His employment started on March 11, 2003.  His job duties were

primarily the unloading of boxes and inventory from incoming trailers by

hand and with forklifts.  His immediate supervisor was Dirk Muncy, the

receiving manager.  Wilkins worked as a probationary employee for the first

90 days.  Kmart expected employees to meet productivity standards by the

end of the probationary period.

Kmart's attendance policy did not allocate specified leave time

12

for probationary employees but required a review of the employee's

attendance at the end of the probationary period.  Following the

employee's satisfactory completion of the probationary period, Kmart's

attendance policy gave each employee a bank of leave hours for a

specified period of time.  As relevant here, Kmart's attendance policy gave

an employee, like the plaintiff, sixteen paid hours and eight unpaid hours

for chargeable absences during the first three months after his probationary

period.  "As a matter of  Kmart policy, absences for workers compensation

injuries, other protected leaves of absences (e.g., FMLA), and leave

covered by other policies (e.g., vacation, bereavement) are not charged

against the 'bank of hours' or otherwise counted against employees."

(Pretrial Order, Stipulation ¶ 32, Dk. 46 at p. 7).  Kmart's attendance policy

provides for termination when an employee has chargeable absences that

exceed his bank of hours.  Termination on this ground is automatic and

without exception.   During 2003, Kmart discharged 45 employees from its

Lawrence Distribution Center for exceeding their bank of hours.

Kmart's policy and practice is that employees leaving work

before the end of their shift receive a pass stating the reason for their early

departure.  The security guard notes the date and time on employees'

passes when they leave the facility.  Kmart has a recording telephone line

for employees to call and report absences that have not been prearranged.

Kmart personnel check the recordings and complete a log showing the

names of the absent employees and the reasons given for the absences.  If

an absent employee does not call the recording line but calls his

department directly, then the department manager is to note the absence

and stated reason for the absence on the department's absent employee

report.

On April 17, 2003, Wilkins reported to his supervisor, Dirk

Muncy, that he was having problems with his right wrist, shoulder and/or

neck.  Wilkins attributed his physical problems to an accident that he said

had occurred several weeks earlier.  Muncy directed his assistant, Judy

Crawford, to investigate the accident, and an accident report was

completed the same day.  The report includes the following statement from

Wilkins as to the accident and injury:

> I was unloading trailer, pulling boxes down over head.  Dropped box
> from overhead, hit my right side of head and right wrist and arm.
> Broken my glasses.  Had to tape glasses.  After that, my wrist started
> hurting.  This week my neck had started hurting.

(Pretrial Order, Stipulation ¶ 11, Dk. 46 at p. 4).   Also on the report, Wilkins

wrote that the accident occurred on March 27, 2003, and with the report in

14

hand, he testified the accident occurred that day.  (Dk. 52, Ex. 3, p. 75).

Wilkins testified that he reported the accident to his supervisor, Dirk Muncy, on "March 27th, the day of the accident."  (Dk. 52, Ex. 3, p. 16).  Wilkins testified that he described the accident to his supervisor saying the box had knocked him to the ground and his glasses were broken.  Wilkins admitted he did not tell his supervisor on March 27 that he was otherwise injured or unable to return to work.  Later in his deposition, Wilkins testified that he had always referred to March 27 as the date of the accident, but that he couldn't recall the exact date, and that he did not dispute the defendant's employment records which showed he was on funeral leave on March 27.  (Dk. 62, Ex. 1, pp. 147-148, 150-151).

Upon receiving on April 17 the plaintiff's report of injury, Muncy and Crawford advised the plaintiff that he would need to see a doctor.  The next morning, Wilkins met with Martha Oelschlaeger, a human resources employee with Kmart, who arranged an appointment that same day for diagnosis and treatment at Lawrence Occupational Health Services (a/k/a Promptcare).

Dr. Bock with Promptcare saw Wilkins on April 18th and diagnosed neck strain and tendonitis in the right wrist.  Dr. Bock prescribed

15

Flexeril (muscle relaxer) and instructed Wilkins to continue taking an over-the-counter pain reliever, to use ice or heat as needed, and to start physical therapy.  Dr. Bock recommended to Wilkins that he take Flexeril primarily before bedtime because it could cause sleepiness.  Wilkins testified that he followed Dr. Bock's recommendation in taking the prescribed Flexeril before bedtime.

During the April 18th visit, Dr. Bock completed a patient visit form that indicated Wilkins could return to work on April 20th with restrictions against lifting more than 50 pounds and repetitive grasping/pinching and pulling/pushing with his right hand.  The form disclosed the diagnosis and the prescribed medication of Flexeril.  Dr. Bock did not check on the form the box indicating that the patient had "been prescribed a medication that may cause drowsiness."  (Dk. 52, Ex. 7-29).

On April 22, 2003, Wilkins complained around 5:00 a.m. during his shift that his wrist was hurting and that he needed to go home to take his medication.  He advised that he would not be able to return to work, as the medication made him sleepy.  Wilkins was released from work, and his absence for the remaining 2.3 hours of his shift was recorded as "occupational" (work-comp related) and not counted against his

16

attendance.  Oelschlaeger contacted Wilkins that same day and discussed his injury, the treatment plan and medication.  They discussed the medical restrictions which did not limit Wilkins from working a full shift.  They also questioned whether the doctor needed to see Wilkins earlier than the next scheduled appointment.

Wilkins did not miss any more work for the remainder of April or May.  Dr. Bock examined and treated the plaintiff on May 2, May 16, and May 30, 2003.  As for Wilkins' use of medication, Wilkins indicated on May 2 that the Flexeril and Aleve had been helpful, on May 16 that he needed a refill of Flexeril, and on May 30 that his use of Flexeril and Aleve was only occasional and as needed.  The records from those visits did not reflect the plaintiff needed additional time off or indicate that his medication would cause drowsiness at work if taken as instructed.  He continued to work with restrictions until May 31, when he was returned to work without restrictions but with instructions to wear a splint.

Wilkins left work early and incurred unpaid time off on the following days:  3.9 hours on June 2, 5.3 hours on June 10, and 5.2 hours on June 12.  Wilkins missed work on June 11, and the absence was coded 8 hours of unpaid time off.  For these time-off periods, the records show

17

"illness" or nothing as the documented reason for the absence.  Wilkins

testified that these absences were due to dizziness and drowsiness and

that he related these reasons for his absences each time to either Muncy

or Crawford.[3]

On June 13, 2003, Wilkins visited Dr. Bock and told his intake

nurse that he felt the Flexeril was making him drowsy.  Dr. Bock testified

that Wilkins did not report the medication's side effects were preventing

him from working.  The records from the visit do not indicate the medication

was interfering with his ability to work.  Dr. Bock gave the plaintiff a full

release to return to work without any restrictions.  Wilkins testified that he

spoke with Dr. Bock and his own treating physician "throughout this period

of time" about being light-headed and dizzy as a result of the medication

and that he continued to experience these symptoms even though he

_____

[3]The defendant objects to this testimony as not competent to prove
the medical cause of the plaintiff's physical problems, as contradicted by
competent medical evidence, and as immaterial concerning the plaintiff's
subsequent absences in June for which he was discharged.  There is no
question that the plaintiff is competent to testify with regard to what he was
physically experiencing (pain, dizziness and other symptoms), what he did
in response to these physical symptoms, and what he communicated to his
doctors and the defendant representatives about the same.  The defendant
appears to concede the same.  (Dk. 66, p. 8).  At this stage, the court shall
consider the plaintiff's testimony as admissible and relevant in proving what
both parties may have known and believed were the reasons for the
plaintiff's absences at the time of discharge.

18

followed their advice of taking the medications at bedtime.

Because of Wilkins' absences on June 11 and 12, Kmart postponed the 90-day review of the probationary period until June 16, 2003. At which time, Kmart found Wilkins to have completed satisfactorily his probationary period. Wilkins now came under Kmart's bank of hours attendance policy, and all of his prior absences were of no significance. It was explained to Wilkins that he had been allocated 16 paid and 8 unpaid hours for chargeable absences for the three-month period beginning June 16, 2003, and ending September 11, 2003.

Between June 17 and June 25, Wilkins left work early on three different days. On June 17, 2003, Wilkins reported to work but left ill before beginning any work. He was charged with eight hours of paid leave. On June 23, 2003, Wilkins left work ill before his shift ended. He was charged with 5.3 hours of paid leave. On June 24, 2003, Wilkins reported to work but left ill before starting his shift. He was charged with 2.7 hours of paid leave and 5.3 hours of unpaid leave. Wilkins testified that on each of those days he told Crawford the reason for leaving work was his problems with pain, "dizziness, drowsiness, and light-headedness." (Dk. 55, Ex. A. p. 103). Wilkins testified that he told Crawford only those reasons and that he

19

did not give her "any other information."  *Id.* at p. 104.  On June 25, 2003, Wilkins called in absent on the recording line,  and the call-in log shows "personal" as Wilkins' reason for the absence.  He was charged with 8 hours of unpaid leave which exceeded his total bank of hours.  Wilkins testified that he was absent on June 25 for the same problems with the medication.

Martha Oelschlaeger, Kmart's human resources representative, telephoned Wilkins on the morning of June 25, 2003.  She advised him that his allotted bank of hours had been exceeded with his last call-in and that he was being terminated consistent with the company's attendance policy. Wilkins told Oelschlaeger that he had been absent because of the medication he was taking for the work injury.  Oelschlaeger asked Wilkins what he had told Muncy or Crawford as the reasons for leaving work and being absent.  Wilkins answered that he had been telling them that the medication made him ill.  Oelschlaeger informed Wilkins that she would investigate the situation and get back with him.

Oelschlaeger spoke with the manager of the third shift.  The manager said that Wilkins told his supervisors he needed to leave because of the heat and medication and that Wilkins never specifically told his

20

supervisors that he had to leave because of pain from his work-related

injury or because of the medication taken for this injury.  Oelschlaeger also

contacted Promptcare and learned that Wilkins had not contacted the

medical office since his release to full duty on June 13 and that he had not

called it with reports of any medication making him ill.    During

Oelschlaeger's investigation, Wilkins' attorney in the workers compensation

matter, faxed a letter to the defendant's human resources department

dated June 25, 2003.  The letter stated in relevant part:

> This is to request that you consider the circumstances of Mr. Wilkins'
> recent absence.  It is my understanding that he had to leave work
> early on Sunday, due to being light-headed and dizzy which is from
> his medication, Flexeril, prescribed by his workers compensation
> physician.  He had discussed with his doctor the problems he was
> having with taking the medication.
>         Please let me know if there is any additional information that
> you need regarding his recent absence.  It is my understanding that
> the medication has now been regulated and that he had requested to
> return to work today.

(Dk. 53, Ex. 7-24).  The defendant did not see his workers compensation

physician or any other physician after his full release to work on June 13

and before his termination on June 26.

On June 26, 2003, Kmart reaffirmed its decision to terminate

Wilkins, and Oelschlaeger informed Wilkins of his termination.  Ultimately,

this decision was made by Jeannine Wyatt, the Human Resources

Manager, after receiving from Oelschlaeger her recommendation and the information gathered by her.  According to Oelschlaeger, this information included the following findings and impressions:  that Wilkins had exceeded his bank of hours, that he claimed his absences were related to his work-related injury after being told of his termination, that his workers compensation physician had given him a full release to work on June 13, that his work-related injury had not previously required him to miss work, that his medications had not previously restricted his work activity, and that Wilkins had not earlier reported his absences or missed work as due to his work-related injury or medication for it.

**ANALYSIS AND HOLDING**

*Prima Facie Case*

The defendant asserts that the plaintiff's prima facie case must include proof that his absences were actually caused by the work-related injury or by the side effects of medication taken for this injury as alleged. The defendant insists that without this proof, the plaintiff has not shown his "absences were in fact 'protected' by the Kansas Workers Compensation Act."  (Dk. 51, p. 22).  The defendant does not cite any direct authority for this proposition.

22

The defendant's argument for requiring proof of medical causation finds no support in the public policy used to justify this tort. Kansas courts crafted the tort of wrongful discharge to prevent employers from coercing employees against the free exercise of their rights under the Kansas Workers Compensation Act. *Coleman v. Safeway Stores, Inc.*, 242 Kan. at 808-09. An employee comes within the protective scope of this tort if he sustains an injury giving him rights under the Act and the employer retaliates against the employee for exercising those rights or for being in a position in which he could or might exercise those rights. *See Bausman*, 252 F.3d at 1115. Consequently, if the employee is not entitled to pursue a workers compensation claim because his only injury is mental which is not compensable under the Act, then the employee cannot prove a prima facie case of retaliation. *Doebele v. Sprint/United Management Co.,* 342 F.3d 1117, 1139-40 (10th Cir. 2003). The plaintiff comes within the protective scope of this tort, as it is uncontested that the plaintiff sustained a work-related injury for which the plaintiff might seek compensation under the Act. *See Gonzalez-Centeno*, 278 Kan. at 437 (the first element of a prima facie case of discrimination is that "[t]he plaintiff failed a claim for workers compensation benefits or sustained an injury for which he or she might

23

assert a future claim for such benefits.")

        Nor does the defendant's argument find any support in the other elements of a prima facie case.  In its reply brief, the defendant attempts to tie this argument to the causal connection element, that is, "a causal connection existed between the protected activity or injury and the termination."  *Gonzalez-Centeno*, 278 Kan. at 437.  As set forth in the pretrial order, the plaintiff alleges as his protected activity–his absences necessitated by his work-related injuries.  (Dk. 46, p. 17).  As with retaliatory discharge claims under other employment discrimination theories and/or statutes, it is enough if the plaintiff has a reasonable good-faith belief that his activity is protected.  *See, e.g.*, *Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1264 (10th Cir. 2001) (it suffices for a retaliation claim under the Americans with Disabilities Act that the employee had a "reasonable, good faith belief" that his activity was protected); *Love v. RE/MAX of America, Inc.*, 738 F.2d 383, 385 (10th Cir. 1984) (a plaintiff's good faith belief that Title VII has been violated will sustain a retaliation claim); *Hutchings v. Kuebler*, 5 F. Supp. 2d 1186, 1197 (D. Kan. 1998) (a plaintiff presents a prima facie case of retaliation under the Kansas Act Against Discrimination "based on requesting

24

accommodation provided that she had a good faith basis for believing she
was entitled to the accommodation requested"); *Brigham v. Dillon
Companies, Inc.*, 262 Kan. 12, 14, 935 P.2d 1054 (1997) (Kansas
recognizes a wrongful termination action for "whistle-blowing–the *good faith*
reporting of serious infractions of rules, regulations, or the law pertaining to
public health, safety, and welfare." (italics added)).  The Tenth Circuit has
referred to this same rule while analyzing a workers compensation
retaliatory discharge case under Kansas law.  *Doebele v. Sprint/United
Management Co.*, 342 F.3d at 1140 (citing *Crumpacker v. Kansas Dept. of
Human Resources*, 338 F.3d 1163, 2003 WL 21872550 at *6 (10th Cir.
2003), *cert. denied*, 540 U.S. 1180 (2004), for the proposition that a
"retaliation claim cannot be based on unreasonable good-faith belief that
underlying conduct violated Title VII.").[4]  Such a rule is in keeping with the
established principle that a "prima facie case is not an onerous burden,"

---

[4]In citing this rule from *Crumpacker*, the Tenth Circuit at least
acknowledges its probable applicability to this Kansas tort. The following
policy judgment found in *Crumpacker* seems consistent with the policy
judgment announced by the Kansas Supreme Court in *Coleman*:

> "By permitting plaintiffs to maintain retaliation claims based on a
> reasonable good-faith belief that the underlying conduct violated Title
> VII, employees are able to report what they reasonably believe is
> discriminatory conduct without fear of reprisal. Strong policy supports
> allowing plaintiffs to maintain such claims."

342 F.3d at 1172.

*Rebarchek*, 272 Kan. at 557 (citation and quotation omitted), while preserving its effectiveness in creating a rebuttable presumption of the employer's retaliatory intent, *Bracken*, 272 Kan. at 1276.  The presumption of an employer's retaliatory intent at the time of the discharge does not depend upon the employee proving later the cause for his absences with competent medical evidence.  It is what the employer knew or should have known at the time of the discharge that is critical to a plaintiff's prima facie case and not what a plaintiff may or may not be able to prove sometime after the discharge as to the actual cause of his absences.  The court rejects the defendant's argument for requiring as part of a prima facie case proof of medical causation for the plaintiff's absences.

The defendant next challenges that the plaintiff is unable to prove the causal connection element between the protected activity and the adverse employment action.  As the court has observed above, the plaintiff's only theory of recovery pleaded in the pretrial order is that the defendant fired him for the protected activity of incurring absences necessitated by his work-related injury.  (Dk. 46, p. 17).  The parties do not dispute that the causal connection element for the plaintiff's prima facie case must include proof that when he was discharged the decision-makers

26

responsible for the termination "were aware or should have been aware

that the absences for which [ ]he was discharged were the result of a work-

related injury."[5]  *Bones v. Honeywell Intern., Inc.*, 366 F.3d at 876.  The

parties do dispute what K-mart's decision-makers knew or should have

known when they fired the plaintiff for these absences.

Both sides frame their presentations around the Tenth Circuit's

extended discussion in *Bausman* on inferring an employer's actual and

constructive knowledge and on evaluating whether workplace policies

permissibly affect those inferences:

> IBC acknowledges that "Kansas law is that the employer is bound by
> what it knew or should have known."  Yet in seeking to comply with

---

[5]In its original memorandum in support of summary judgment, the defendant appears to advocate requiring the plaintiff to prove the defendant's unlawful retaliatory intent as part of his prima facie case.  (Dk. 51, pp. 24-25).  The defendant relies on language found in *Bones* that cites to *Bausman* as its authority.  366 F.3d at 876.  Reading *Bones* and *Bausman* together, the court understands the language in question to reference a plaintiff's ultimate burden of proof on causation and not to define the required causal connection proof for a prima facie case.  The defendant's construction of *Bones* ignores the very reason for a prima facie case, that is, the presentation of circumstantial evidence that gives rise to a rebuttable presumption of the employer's retaliatory intent.  To collapse the plaintiff's burden of proving an unlawful intent into the prima facie case also would render superfluous "an important function" of the prima facie case, that is, to eliminate "the most common nondiscriminatory reasons" for the adverse employment action.  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Kansas law, IBC would confine what it "knew or should have known" about the reason for Ms. Bausman's absence to what it read in physician's notes submitted by Ms. Bausman.

In many instances, an employer's request for corroboration by a medical professional of an employee's claim of absence due to injury represents a reasonable means of investigating and verifying the reason for an employee's absence. It does not unduly burden or restrict an employee's statutory right to workers' compensation for a work-related injury to request third-party verification where there is room for doubt concerning a particular absence.

At the same time, an employer cannot adopt a workplace policy by which the employer abdicates its duty to see, to hear, and to think. The fact that some issues that arise in the workplace prove difficult to decide does not mean that an employer need not decide them, or that they may routinely be avoided as a matter of "unwritten policy." The employer's policy itself must be informed by the public policy of the State of Kansas, which protects employees against termination for absenteeism where those absences result from a work-related injury and holds employers accountable for what they "knew or should have known" about the cause of an employee's absence. This remains a fact-driven determination, not a question of unwritten policy.

. . . . Actual knowledge of an employee's absence due to a work-related injury likewise should suffice for purposes of the Kansas public policy vindicating the statutory workers' compensation remedy.

An employer may not limit in advance what it "knows or has reason to know" about an employee's absence due to workplace injury to only one kind or source of information, blinding itself to other observable facts. The Kansas "knew or should have known" standard charges an employer with knowledge of those facts concerning an employee's workplace injury reasonably available to the employer at the time. Kansas law enforces a rule of reason, a rule that must be applied even-handedly in balancing the interests of both the employer and its employees.

Electing to hear only those explanations proffered by physicians, IBC deftly sidesteps the more problematic issues of employee credibility, and feigned injury or incapacity. Indeed, IBC's practice simply hands off these problematic issues to medical

professionals to resolve, wholly discounting IBC's own knowledge of what is happening in the workplace in favor of what verification an employee may or may not be able to obtain from a physician . . . . This goes too far. Coleman and its progeny expect an employer to act upon what facts it knows or should know, not upon an unwritten practice that leads to conscious avoidance of those facts on the part of the employer.

If absent third-party verification an employer would discount or reject an employee's assertion of work-related injury, then the request for verification should be explicit and unequivocal, leaving no uncertainty as to the information that is required. Otherwise, the practice merely becomes a trap for the unwary-a trap that could be relied upon to mask an employer's unlawful retaliatory intent, as is alleged in this case.

252 F.3d at 1121-22.[6]

Though not relying on any policy requiring third-party verification of the medical reasons for absences, the defendant argues its actions are consistent with the policy discussion in *Bausman*.  Namely, the defendant contends that at the time of the discharge it investigated the plaintiff's claim by checking the plaintiff's employment, attendance and medical records and speaking with a supervisor and the office of the plaintiff's treating physician.  After making this investigation, the defendant

---

[6]This language comprises a separate section of the panel's opinion in *Bausman*.  The court quotes most of the section here to emphasize that it should be read and construed as a whole and as closely tied to its facts. There is reason to be concerned that a broad reading of isolated excerpts of this section could sustain the same confusion that has accompanied the courts' efforts at applying the rule from *Coleman*.

concluded that the plaintiff's claim of his absences being the result of a work-related injury "was simply not credible or persuasive."  (Dk. 51, p. 26). As the defendant puts it, "Kmart did 'not limit [itself] . . . to only one kind or source of information, blinding itself to other observable facts,' but rather considered all the information concerning Plaintiff's absences which was 'reasonably available . . . at the time.'"  *Id.*  Finally, the defendant argues that the knowledge standard as a rule of reason evenhandedly applied in the balancing of the interests of both the employer and its employees does not require an employer to accept blindly an employee's claimed reason for an absence.

Based on what he told his supervisors and the defendant's human resource department, the plaintiff contends the defendant actually knew all of the absences cited as the basis for his discharge were caused by the medication that he was taking for his work-related injuries.  During his shift on April 22, 2003, the plaintiff complained of pain from this work-related injury and asked to go home to take his pain medication.  The plaintiff explained at that time that he would be unable to return as his medication made him sleepy.  The defendant recorded this absence as occupational.  The plaintiff went home early or was absent on June 2, 10,

30

11 and 12.  The plaintiff testified he told his supervisor's representative on

each of those dates that he was dizzy, drowsy, light-headed and having

problems staying awake.  The defendant's representative on each

occasion responded that it was not safe for the plaintiff to remain at work or

operate a forklift.  On June 13, 2003, Wilkins visited his treating physician,

Dr. Bock, and informed the intake nurse that he felt the Flexeril was making

him drowsy.  He also spoke with Dr. Bock about these side effects from the

medication.  For each instance of leaving work early or absence that

serves as the basis for the defendant's discharge, the plaintiff has testified

that he told his supervisor's representative, Judy Crawford, at the time his

need for leaving or missing work.  Each time he gave the reason that he

was unable to work because of "dizziness, drowsiness, and light-

headedness," and each time Ms. Crawford responded that he should go

home as it would be unsafe for him to work.    For three of the absences,

Ms. Crawford recorded on company's attendance records as the only

reason that Wilkins was "ill," and the call-in log for the last absence lists the

only reason as "personal."  When informed on June 25 that he was being

discharged for exceeding his bank of hours, the plaintiff told Martha

Oelschlaeger, Kmart's human resources representative, that he had been

31

absent because of the side effects from medication he was taking for the work injury.  Wilkins also told Oelschlaeger that he had told his supervisors he was unable to work because the medication made him ill.  The next day Oelschlaeger informed Wilkins of Kmart's final decision to terminate him.

Drawing all reasonable inferences in the plaintiff's favor and leaving the credibility calls to the finder of fact, the court concludes the plaintiff's testimony raises a triable issue of fact as to whether the defendant discharged the plaintiff for absences which it knew or should have known were due to the medication that the plaintiff was taking for the work-related injury.  It is enough for the plaintiff to have a reasonable good-faith belief that his activity is protected, that is, his absences were not chargeable against him as they were caused by medication he was taking for his work-related injury.  The defendant states several plausible grounds for disbelieving the plaintiff, but their cumulative weight does not render the plaintiff's contrary belief unreasonable.  As the Tenth Circuit said in *Bausman*, an employer is charged "with knowledge of those *facts* concerning an employee's workplace injury reasonably available to the employer at the time."  252 F.3d at 1121-22.  Giving full weight to the plaintiff's testimony, the court cannot say as a matter of law the defendant

did not reasonably know and understand prior to June 25 that the plaintiff

considered his absences to be the result of his work-related injury.  Further

inquiry into the defendant's disbelief is reserved for latter stages of the

burden-shifting approach.  The court concludes the plaintiff has established

a prima facie case of retaliatory discharge.

*Pretext*

The burden shifts to the defendant employer to show an

articulate, non-retaliatory reason for the plaintiff employee's discharge.

The defendant has done so by offering that the plaintiff exceeded his bank

of allotted hours and was subject to discharge under the attendance policy

and that the defendant did not believe the plaintiff's absences were work-

related after its investigation of the facts.[7]  The defendant's disbelief of the

---

[7]In his motion for summary judgment, the plaintiff argues without any
citation of published case law having precedential weight that the
defendant's articulated reason necessarily violates Kansas public policy
and that the plaintiff is not required to show pretext.  (Dk. 54, p. 17).  "Once
defendant admits, as the defendant did in this case, that it fired an injured
employee for absences for which the employee reported were necessitated
by a work injury, defendant is liable for retaliatory discharge.  The only
requirement is actual knowledge by the defendant."  *Id.* at p. 16.  This
sweeping proposition is not a correct understanding of Kansas law.  *See
Bausman v. Interstate Brands Corp.*, 50 F. Supp. 2d 1028, 1043-44 (D.
Kan. 1999), *rev'd on other grounds*, 252 F.3d 1111 (10th Cir. 2001). As laid
out earlier in this order, the employer's knowledge is the additional proof
needed to sustain a prima facie case, that is, an inference of unlawful
retaliatory intent, as it eliminates an employer's most common non-

33

plaintiff under the circumstances raises a triable issue as to its legitimate, non-retaliatory reason for discharge.  252 F.3d  at 1120.

        In this summary judgment context, the burden now shifts back to the plaintiff to show "a genuine dispute of material fact" that the defendant employer's stated reasons are "unworthy of belief." *Bausman*, 252 F.3d at 1120.  Rather than having to demonstrate affirmatively "that retaliatory reasons motivated" the defendant's discharge decision, the plaintiff may rely on "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons." *Id.* (internal quotation marks and citations omitted).  From a showing "that the employer's proffered reason for taking adverse action is false, the factfinder could infer that the employer was lying to conceal its retaliatory motive." *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1317 (10th Cir. 2006) (internal quotation marks and citation omitted). On the issue of pretext, the court may also consider the plaintiff's prima facie case and the inferences of retaliatory intent properly drawn therefrom. *Id.*

---

retaliatory reason for discharging an injured employee for absences.  An employer's liability for this intentional tort is not established by a mere finding of actual knowledge but only upon a finding of retaliatory intent.  An employer does not violate Kansas public policy unless the discharge was in retaliation for the employee's protected activity. *Ortega v. IBP, Inc.*, 255 Kan. at 517-18.

On this issue of pretext, the defendant's memoranda outline in substantial detail its non-retaliatory treatment of the plaintiff prior to the discharge and Oelschlaeger's good faith investigation of the plaintiff's absences before the final termination. The defendant denies the plaintiff can present any evidence of ill will or animus on the part of the defendant's decision-makers or that the defendant's articulated reasons are false. The defendant emphasizes that the inquiry is not whether its "proffered reasons were wise, fair or correct, but whether . . . [it] honestly believed those reasons and acted in good faith upon those beliefs." *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999) (citations omitted). A detailed review of the summary judgment record shows the defendant's proffered reasons and supporting arguments are not without considerable evidence and reasonable inferences therefrom.

Even so, the decisions of *Bausman* and *Gonzalez-Centeno* counsel against summary judgment here. In those retaliatory discharge cases, the appellate courts reversed summary judgment orders that were based on the plaintiffs' failure to prove pretext in the employer's enforcement of the attendance policy. In each case, the appellate court emphasized that there remained an inference of retaliatory intent from the

35

plaintiff's proof the employer discharged him despite knowledge that the employee was claiming his absences were due to a work-related injury. In *Bausman*, the Tenth Circuit also attached significance to the manner in which the defendant enforced the attendance policy, the supervisors' knowledge of the plaintiff's ongoing problems with the work-related injury, and the defendant's other policies supporting an inference of unlawful animus. 252 F.3d at 1122. In *Gonzalez-Centeno*, the Kansas Supreme Court also considered that the defendant employer placed a unique reporting requirement on the plaintiff employee and terminated the employee after only one warning about not complying with this requirement. 278 Kan. at 440.

When considered in the light most favorable to him, the plaintiff's evidence is not meaningfully distinguishable in nature or strength from that found sufficient in *Bausman* and *Gonzalez-Centeno* to create a genuine issue of material  fact. The plaintiff presents a prima facie case that sustains an inference of the defendant's unlawful retaliatory intent. The plaintiff also offers other evidence of pretext in the form of admissions, contradictions and inconsistencies. The plaintiff has testified that when he was terminated the defendant's representative, Martha Oelschlaeger, told

36

him that he had exceeded his bank of hours "for problems . . . [he] was

having with . . . [his] medication."  (Dk. 55, Ex. A. p. 14).  Ms. Oelschlaeger

knew the medication prescribed for the plaintiff's work-related injury caused

drowsiness.  She was the defendant's representative who talked in April

with the plaintiff about side effects from medication interfering with his

work.  From Ms. Oelschlaeger's investigation on June 25 and 26, the

defendant learned that the plaintiff had told his supervisor that he was sick

indicating problems with heat and medication.  None of the defendant's

recorded reasons for the plaintiff's absences included problems with

"medication."  Ms. Oelschlaeger and the defendant's other decision-makers

chose to disbelieve the plaintiff in part because he did not say specifically

to his supervisors that the medication he was taking for his work-related

injury was the medication making him ill.  The summary judgment record

does not show that plaintiff's supervisors knew he was taking other

medications besides that needed for his work-related injury or that his

supervisors asked the plaintiff about a possible connection between the

medication and his work-related injury.  These circumstances certainly are

not immune from arguable inferences of pretext.  After hearing all the

testimony and evidence presented and after evaluating the credibility of the

witnesses, it is for the finder of fact to resolve whether the defendant actually disbelieved the plaintiff's claimed reason for the absences and fired him for exceeding the bank of hours or whether the defendant's expressed disbelief was a mere pretext for discharging him in retaliation for his absences caused by the work-related injury.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment (Dk. 50) and the plaintiff's motion for summary judgment (Dk. 53) are denied.

Dated this 16th day of November, 2006, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge